## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No.: 20-cv-00214-WJM-KLM

**MARY QUINTANA,**

 **Plaintiff,**

**v.**

**CITY AND COUNTY OF DENVER, a municipality,**
**POLICE CHIEF PAUL PAZEN, in his individual and official capacities,**
**JUSTIN DODGE, in his individual and official capacities,**
**RICHARD EBERHARTER, in his individual and official capacities,**
**BRENT KOHLS, in his individual and official capacities,**
**MARDIE PEREZ, in her individual and official capacities; and**
**MYRON ALEXANDER, in his official and individual capacities.**

 **Defendants.**

---

### FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Mary Quintana ("Ms. Quintana") or ("Plaintiff"), by and through her attorney,

Joseph A. Salazar of SALAZAR LAW, LLC, respectfully alleges for her First Amended

Complaint as follows:

### INTRODUCTION

1. This is an action for damages against Defendants for violating Ms. Quintana's

rights under the Fourth and Fourteenth Amendments of the United States Constitution and under

state law.

2. Specifically, Ms. Quintana alleges that Defendants City and County of Denver

("Defendant Denver" or "Denver"), Defendant Police Chief Paul Pazen ("Defendant Pazen"),

and Defendant Justin Dodge ("Defendant Dodge" or "Dodge") failed to adequately train and

supervise Denver Police officers in the use of flammable chemical agents and in the seizure and detention of individuals, and that it is an official custom, practice, and policy of Denver and its decisionmakers to fail to adequately train and supervise its officers in the appropriate use of flammable chemical agents, and in seizing and detaining individuals without probable cause or reasonable suspicion. These acts were intentional, grossly negligent, knowing, reckless and wanton through official governmental custom, policy, or practice, and with deliberate indifference to her constitutional rights.

3.      Ms. Quintana further alleges that her Fourth Amendment rights were violated when she was illegally seized by Defendants Mardi Perez ("Defendant Perez") and Myron Alexander ("Defendant Alexander"). Ms. Quintana was not a suspect nor was there reasonable suspicion or probable cause to cause her illegal seizure by armed officers, questioned, and held in the back of a police car for numerous hours. These acts were intentional, knowing, reckless and wanton, through official governmental custom, policy, or practice, and with deliberate indifference to her constitutional rights.

4.      Ms. Quintana also alleges that Defendants Dodge, Richard Eberharter ("Defendant Eberharter"), and Brent Kohls (Defendant Kohls") violated Plaintiff's Fourth and Fourteenth Amendment rights when they recklessly, knowingly, intentionally, willfully, and wantonly threw flammable chemical agents, specifically and conspicuously rated for outdoor use, into Ms. Quintana's home resulting in her home catching fire, which gutted her house, destroyed her personal effects, and rendered Ms. Quintana homeless.

5.      It is further alleged that all of Defendants' conduct occurred under color of law and proximately caused the deprivation of Ms. Quintana's federally protected rights.

6. Moreover, it is alleged that Defendants Dodge, Eberharter, and Kohls negligently and through willful and wanton action or conduct destroyed Ms. Quintana's home through the use of flammable chemical agents, specifically and conspicuously rated for outdoor use, into Ms. Quintana's home, which resulted in the loss of her property and personal effects, and rendered her homeless.

7. It is further alleged that Defendants Dodge's, Eberharter's, and Kohls' willful and wanton conduct and actions violated state law that is designed to protect personal property, which resulted in the loss of Ms. Quintana's property and personal effects, and rendered her homeless.

## JURISDICTION AND VENUE

8. This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction over these claims is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Jurisdiction supporting Plaintiff's claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988.

9. The Court has supplemental jurisdiction over Ms. Quintana's state law claims as the state and federal claims derive from a common nucleus of operative facts and should be tried in one proceeding. 28 U.S.C. § 1367.

10. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred in the State of Colorado, County of Denver, and all of the parties were residents of the State of Colorado at all relevant times stated herein.

## PARTIES

11.     At all times relevant to this Complaint, Ms. Quintana was a citizen of the United States of America and resident of the State of Colorado, County of Denver. Ms. Quintana was the owner of the home that was set on fire and burned by Defendants. Ms. Quintana also was illegal seized without reasonable suspicion or probable cause.

12.     Defendant City and County of Denver is a Colorado municipal corporation. Defendant Denver's Department of Safety is responsible for the oversight, supervision, and training of the Denver Police Department ("DPD"). Defendant Denver was at all relevant times the employer of the individual defendants and is a proper entity to be sued under 42 U.S.C. § 1983.

13.     At all times relevant to the subject matter of this litigation, Defendant Police Chief Paul Pazen was a citizen of the United States of America and a resident of the State of Colorado, and was acting under the color of state law in his capacity as a law enforcement officer employed by Defendant Denver. Under his authority as Chief of Police, Defendant Pazen was responsible for hiring, training, supervising, and disciplining Denver Police officers. Defendant Pazen, as Chief of Police and a decisionmaker for the Denver Police Department, oversaw the incident that resulted in the burning down of Ms. Quintana's home, and her illegal seizure and detention.

14.     At all times relevant to this Complaint, Defendant Justin Dodge was a member of Metro SWAT, is identified as a sergeant in numerous documents, was a citizen of the United States of America and resident of the State of Colorado, and was acting under the color of state law in his capacity as a law enforcement officer employed by Defendant Denver. Defendant Dodge, as a sergeant overseeing operations involving the deployment of chemical munitions,

was a decisionmaker for METRO SWAT on the scene, and made decisions and directed

subordinate officers to engage in unlawful acts and conduct that resulted in the burning of Ms.

Quintana's home.

15.     At all times relevant to this Complaint, Defendant Richard Eberharter was a

member of Metro SWAT, was a citizen of the United States of America and resident of the State

of Colorado, and was acting under the color of state law in his capacity as a law enforcement

officer employed by Defendant Denver.

16.     At all times relevant to this Complaint, Defendant Brent Kohls was a member of

Metro SWAT, was a citizen of the United States of America and resident of the State of

Colorado, and was acting under the color of state law in his capacity as a law enforcement officer

employed by Defendant Denver.

17.     At all times relevant to this Complaint, Defendant Mardie Perez was a member of

the Denver Police Department, was a citizen of the United States of America and resident of the

State of Colorado, and was acting under the color of state law in her capacity as a law

enforcement officer employed by Defendant Denver.

18.      At all times relevant to this Complaint, Defendant Myron Alexander was a

member of the Denver Police Department, was a citizen of the United States of America and

resident of the State of Colorado, and was acting under the color of state law in his capacity as a

law enforcement officer employed by Denver.

## COLORADO GOVERNMENTAL IMMUNITY ACT NOTICE

19.     On June 25, 2019, Plaintiff timely mailed, via certified mail, a Colorado

Governmental Immunity Act ("CGIA") notice to Denver's Office of the City Attorney informing

it of her intent to file several various tort claims against Defendants, including, but not limited to negligence and negligence per se.  The CGIA Notice was received by the City Attorney's Office on June 28, 2019.

20.     Plaintiff also has submitted numerous Colorado Criminal Justice Records Act ("CCJRA"), which have been partially fulfilled. A substantial amount of information, however, has been redacted or withheld from Plaintiff.

21.     In anticipation of the Court ordering Defendants to produce all relevant documents in this matter, and should the documents identify other tortious conduct, Plaintiff intends to file a subsequent CGIA Notice based on potential tort claims not currently known.

## STATEMENT OF FACTS

22.     Plaintiff Quintana realleges and incorporates the preceding paragraphs as if fully set forth herein.

### A.     The Initial Call

23.     On January, 27, 2019, at 11:41 a.m., Denver Police Department dispatch ("DPD") received a call about shots being fired around 6th and Inca. Police officers were dispatched to the area to investigate the call.

24.     During the investigation, it was reported that at least one spent ammunition cartridge was found outside the home of Ms. Quintana, located at 622 Inca Street, Denver, Colorado.

25.     Denver officers ran a check on the house and discovered that Joseph Quintana ("J. Quintana") may be a resident of the house and he had a warrant for his arrest.

26.     At the time of their investigation, Denver officers were not aware that J. Quintana was in the residence.

27.     Denver officers contacted Ms. Quintana and asked her to come to her residence.

28.     She was located on the westside of Denver at the time of the call.

29.     Around 1:00 p.m., Ms. Quintana voluntarily arrived at her residence. She was met by Denver officers. Her second son, Phillip Quintana ("P. Quintana") also arrived at Ms. Quintana's house.

30.     Plaintiff was asked whether she was aware if J. Quintana was in her home. Ms. Quintana indicated that she was not certain.

31.     Denver officers requested that she open the door and allow them to enter the residence. Ms. Quintana agreed.

32.     Concerned about his mother's safety, P. Quintana agreed to approach the house and open the door for Denver officers.

33.     P. Quintana approached the door with several Denver officers accompanying him. He yelled into the house for J. Quintana.

34.     As he unlocked the door, Denver officers pushed P. Quintana aside and burst into the house.

35.     P. Quintana waited outside on the front porch while Denver officers inspected the house.

36.     Denver officers inspected the house and did not find J. Quintana in any of the common areas of the house.

37.     Instead, they found J. Quintana in the basement. Denver officers ordered J. Quintana to exit the basement.

38.     Hearing no response, a Denver officer went down into the basement where he encountered J. Quintana.

39.     Shots were fired and the Denver officer was hit in the Kevlar vest right around his abdomen.

40.     Numerous shots were fired by Denver officers into the basement as they pulled the first Denver officer to safety.

41.     At 1:31 p.m., it was reported to dispatch that an officer was down.

42.     All of the Denver officers retreated from the home to the front of the house.

43.     While outside the home, and treating the wounded officer, more shots came from inside the home and a bullet struck a second Denver officer in the leg.

44.     Numerous officers fired shots into the house.

45.     According to dispatch notes, within a matter of minutes of the "officers down" call, dozens of Denver officers descended on the house, the perimeter of the house was secured, and command posts were setup at 7th and Galapago.

**B.     Police Secure the Area**

46.     According to police officer reports, Metro SWAT arrived at the house and took positions around the perimeter, including positioning themselves in the back alley, and on rooftops of homes surrounding Ms. Quintana's home.

47.     Bearcat vehicles also started to arrive and were positioned outside the front and back of the house.

48.     Sixth Avenue traffic traveling eastbound was shut down and redirected.

49.     In sum, a DPD investigative report demonstrates that the area was secured by DPD within the first hour of the encounter with J. Quintana.

50.     For the next several hours, J. Quintana remained in the house while DPD attempted to convince him to leave the residence and surrender.

**C.     Chief Pazen's Press Conference**

51.     As the area was being secured by the Denver Police Department, Defendant Pazen, in his position as Chief of Police, held a televised press conference outside of Denver Health Medical Center. Defendant Pazen notified the press that, "[DPD] contained the situation and [they] are hoping to resolve this in the safest manner possible."

52.     He also indicated the following:

> *We have our resources out there trying to resolve this in as safe a manner as possible. We want safety for everybody including the person that did this. We want to make sure that we can get them out in a safe manner. Safety of the community is very important for us.*

53.     Defendant Pazen provided every indication that he was monitoring the situation and in control.

54.     According to Denver Police Department's Operations Manual, the Chief of Police is the highest ranking officer.

55.     Orders from the Chief of Police then filter down through the chain of command.

56.     Upon information and belief, Defendant Pazen had situational awareness of the unfolding situation.

57.     Upon information and belief, Defendant Pazen was aware of the various actions and tactics of subordinate officers, and approved of those tactics and actions.

58.     Upon information and belief, Defendant Pazen was a part of the METRO Command and the Command Post.

**D.      Metro SWAT Officers Destroy Ms. Quintana's House.**

59.     In multiple reports, Metro SWAT officers admitted that during the standoff, they devised a plan to use chemical agents.

60.     As stated by Defendant Dodge, the plan to deploy chemical agents "and actions taken by Metro personnel were communicated with Metro Command and the command post personnel."

61.     Upon information and belief, Defendant Pazen issued orders to individual Defendants, and/or agreed to strategies and plans involving the use of flammable chemical ammunition, specifically and conspicuously rated for outdoor use, to be fired into or thrown into Ms. Quintana's home.

62.     Upon discussing with Metro Command, Defendant Dodge ordered the other Defendant officers to prepare the burn boxes and to deploy them inside Ms. Quintana's home.

63.     According to Denver Police Department manuals, the authorization for use of chemical agents is ordinarily not given to officers below the rank of sergeant.

64.     With METRO Command and the Command Post's approval, Defendant Dodge, as a sergeant, was given authority as a decisionmaker to use flammable chemical agents, specifically and conspicuously rated for outdoor use, inside of Ms. Quintana's home.

65.     Denver Police Department has operations manuals, policies, and procedures prohibiting unauthorized use of force.

66.     Using flammable chemical munitions, specifically and conspicuously rated for outdoor use, is excessive use of force.

67.     Defendant Dodge has been previously accused of using excessive force in a case that resulted in the death of a suspect for which he did not receive discipline.

68.     According to reports, from 4:32 p.m. until 5:27 p.m., chemical agents were fired into Ms. Quintana's home.

69.     At least three rounds of chemical agent were fired into the house via a 40 mm launcher.

70.     At least one round of "flameless" chemical agent was thrown into Ms. Quintana's home.

71.     Another several rounds of flammable chemical agent were thrown inside the house in vented metal boxes, described as a "burn box."

72.     The "flameless" chemical agent was not placed in any "burn box."

73.     Officer Craig Moen wrote in his report that Defendant Dodge directed several members to deploy CS chemical agent via a "secured ammo box."

74.     Defendant Kohls was "asked to prepare one of the chemical munition boxes." According to Defendant Kohls, he "prepped it by securing a canister of CS spredeheat inside a metal box."

75.     According to police reports, a burn box is a "vented steel box."

76.     A request was made to the Denver Police Department to provide training manuals, policies, procedures, or regulations related to the deployment of flammable chemical agents in burn boxes.

77.     No such materials were provided by the Defendant Denver.

78.     Defendant Eberharter admits in his report that he deployed the burn boxes inside the house.

79.     Video footage shows that the burn boxes were just randomly thrown inside the house without any care for placement or whether the boxes would land near flammable materials.

80.     At 5:27 p.m., it was reported that the house was on fire.

81.     While the house was on fire, Metro SWAT prohibited the Denver Fire Department ("DFD") from fighting the fire.

82.     Instead, at the direction of Defendant Dodge, Metro SWAT officers began fighting the fire until it was confirmed that J. Quintana had been arrested.

83.     Upon information and belief, none of the METRO SWAT officers at the scene are trained firefighters.

84.     A significant portion of Ms. Quintana's house was destroyed by fire.

85.     The house was not safe to reenter or to be inhabited by Ms. Quintana.

86.     As a result of the unlawful acts of the Defendants, Ms. Quintana was rendered homeless and forced to live with others.

**E.      Denver Fire Department Report.**

87.     Once the house was considered safe to enter, the Denver Fire Department ("DFD") conducted an investigation into the source of the fire.

88.     In a report, DFD indicated that a CN/CS grenade within a burn box "was observed on the metal frame of the futon, at the northwest corner."

89.     DFD specifically noted that according to Defense Technology, "the CN/CS grenade is designed **specifically for outdoor use** due to its fire-producing capability."

90.     After ruling out all other possibilities, DFD concluded that the probable ignition source was the CN/CS grenade contained within the burn box.

91.     Documents from Defense Technology specifically state that the grenades used by Defendants are for outdoor use only.

92.     Easily accessible pictures from Defense Technology's website support that the chemical agents used by Defendants is designed for outdoor use.

93.     The flammable chemical agents used by Defendants are for crowd control, not situations involving a suspect who has barricaded himself inside a residence.



**The Riot Control CS Grenade is designed specifically for outdoor use in crowd control situations with a high volume continuous burn that expels its payload in approximately 20-40 seconds through four gas ports located on the top of the canister. This grena…**



94.     Easily accessible technical specifications about the chemical agents used by

Defendants clearly indicate that Defendants should not have deployed the grenades inside Ms.

Quintana's house because of its fire-producing capabilities.

95.     In fact, according to the specifications, the product becomes so hot that an individual would need welder's mitts to hold the container.

96.     Essentially, when Defendants placed the fire-producing grenades in a metal vented box, they created a much larger fire-producing metal box.

97.     The grenade offers coverage for "large outdoor areas."

98.     The room inside Ms. Quintana's home where the burn boxes were deployed was neither large nor outdoor.

**F.      Unlawful Detention of Plaintiff**

99.     As indicated above, Ms. Quintana voluntarily drove to her house at the request of Denver officers around 1:00 p.m.

100.    She was compliant with officers' requests to allow them inside her house.

101.    At no point was Ms. Quintana hostile with officers, she did not fail to obey their orders, and she did not engage in any obstructing behavior.

102.    After shots were fired by J. Quintana, unknown police officers took Ms. Quintana to an area a block away from her house.

103.    They placed Ms. Quintana in a police vehicle and in the custody of Defendants Perez and Alexander.

104.    For the next five hours, Ms. Quintana was not allowed to leave the vehicle without an armed police officer.

105.    Video shows that she was constantly asked questions about her son.

106.    She answered all the questions to the best of her ability, and she asked several questions as well.

107.     She constantly asked to speak with her son, J. Quintana in order to talk him out of the house.

108.     These requests were denied.

109.     At one point, she indicated that she needed the restroom. Defendant Alexander asked Defendant Perez to escort her to the bathroom.

110.     During their walk to a gas station bathroom, Defendant Perez advised Ms. Quintana not to run or Defendant Perez would tackle Ms. Quintana.

111.     At the time, Ms. Quintana was 64-years-old, and she had no intentions to run. She gave no sign that she intended to run.

112.     Ms. Quintana felt like a prisoner. Ms. Quintana knew that she was not free to leave at any point.

113.     Around 6:58 p.m., about an hour-and-a-half after J. Quintana was placed in custody, Ms. Quintana was released by DPD.

114.     Upon information and belief, Defendant Pazen was aware of and gave tacit approval of Ms. Quintana's seizure and detention without probable cause or reasonable suspicion.

115.     At that point, a house Ms. Quintana lived in for over 40 years, and raised her kids in, was significantly burned, uninhabitable, and she was now homeless.

**G.     Post Situation Press Conference**

116.     Later that evening, Defendant Pazen held a press conference updating the press and community about the situation. As Chief of Police, Defendant Pazen acknowledged that the event took approximately six hours and stated the following:

> *Our special operations team responded and unfortunately there*
> *was a fire at this residence… what's important is to let the*
> *community know that this situation is resolved.*

117.     Defendant Pazen reassured the press and community that he would share the results of the investigation "to figure out exactly what happened here today."

118.     Defendant Pazen did not defer to any other commanding officer to answer questions.

119.     Defendant Pazen indicated that he was at the hospital meeting with officers, at headquarters meeting with officers, and at the scene.

120.     Defendant Pazen did not indicate that he was not in control or did not oversee the situation.

## H.     Defendant Denver's Troubling History of Unlawful Conduct

121.     Throughout the years, Defendant Denver has settled numerous claims alleging excessive force, failure to train, failure to supervise, and illegal seizure.

122.     In total, these settlements are in the amount of millions of taxpayer dollars. There are numerous example of excessive force, failure to train, and failure to supervise.

123.     As far back as August 23, 1993, the Tenth Circuit Court of Appeals upheld a district court's decision to award $330,000 to plaintiffs for an excessive force and failure to train its police officers. *Zuchel v. City and County of Denver*, 997 F.2d 730 (10th Cir. 1993).

124.     In May 2011, Defendant Denver settled an excessive force case for $795,000.

125.     That same year, Defendant Denver settled another case brought by the ACLU involving an illegal seizure of two individuals. *Sanchez, et al. v. City and County of Denver*, 11-cv-780-RBJ-KMT.

126.     In another instance, Defendant Denver paid $225,000 to a man struck by a police officer and suffered a broken leg following a verbal altercation.

127.     Around the same time and involving the same officer, Defendant Denver agreed to pay $860,000 to a disabled veteran who was beaten to the point where his heart stopped beating and paramedics had to save his life.

128.     On March 2, 2015, Defendant Denver settled an excessive force case for $50,000.

129.     In April 2019, Defendant Denver approved a payout of $60,000 to settle a claim of excessive force against two Denver police officers.

130.     In September 2019, Defendant Denver settled an excessive force claim for $500,000.

131.     Presently, Senior Judge Marcia Krieger, denied Defendant Dodge's motion to dismiss and a motion for summary judgment in a separate case alleging excessive force against Defendant Dodge. *Estate of Joseph Valverde v. Justin Dodge*, 16-cv-1703-MSK-MEH.

132.     Instead of disciplining Defendant Dodge for this incident that led to the death of a suspect, Denver gave Defendant Dodge an award.

133.     Excessive force, failure to train, and failure to supervise cases are still be alleged against Defendant Denver and Denver Police officers despite an excessive force policy developed in 2018 that mandates that police officers intervene if they feel that one of their counterparts is using too much force and to report excessive force, and that non-force alternatives and de-escalation tactics are to first be used before resorting to force.

134.     In this matter, none of the individual Defendants has been disciplined for violating department policies or for violating Ms. Quintana's constitutional or statutory rights.

**FIRST CLAIM FOR RELIEF**
**Negligence (Dodge, Eberharter, and Kohls)**

135.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

136.    Defendants were aware that the fire-producing grenades they prepared and threw into Ms. Quintana's home were specific for outdoor use and were not to be used indoors.

137.    Defendants had a duty not to use these fire-producing grenades indoors.

138.    Despite the limitation of use for these grenades, Defendants willfully and wantonly prepared the fire-producing grenades, placed them inside vented metal boxes, and threw them into Ms. Quintana's house.

139.    Defendants willfully and wantonly did not look to see where the burn boxes would be thrown inside the house.

140.    DFD confirms that it was one of the metal boxes prepared and thrown into Plaintiff's house that started the fire.

141.    Defendant Dodge, as the sergeant commanding the use of chemical munitions, willfully and wantonly approved the negligent use of the flammable grenades and the use of the vented metal boxes.

142.    Defendants' acts or omissions created a danger or risk to the safety of others, and they still acted without regard to the danger or risk.

143.    Defendants' acts and conduct were willfully and wantonly committed, which they knew was dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly Ms. Quintana.

**SECOND CLAIM FOR RELIEF**

20

## NEGLIGENCE PER SE (Dodge, Eberharter, and Kohls)

144.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

145.    Defendants were aware that the fire-producing grenades they prepared and threw into Ms. Quintana's home were specific for outdoor use.

146.    Nonetheless, Defendants willfully and wantonly prepared the fire-producing grenades and threw them into Ms. Quintana's home.

147.    Defendants' willful and wanton acts and conduct recklessly started a fire in Ms. Plaintiff's home and placed Ms. Quintana's home in danger of damage.

148.    Colorado law establishes a statutory standard prohibiting the reckless starting of a fire in a person's home. § 18-4-105, C.R.S. (2019).

149.    Ms. Quintana is a member of a class the statute is intended to protect, and the injuries she suffered were the kind the statute was enacted to prevent.

150.    Defendants' willful and wanton conduct is the proximate cause of the injuries suffered by Ms. Quintana.

151.    Defendants' acts and conduct were willfully and wantonly committed, which they knew were dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly Ms. Quintana.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment as Enforced Through the Fourteenth Amendment
### Unlawful Seizure (City and County of Denver and Defendants Perez and Alexander)

152.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

153.    For a period of nearly six hours, Ms. Quintana was detained by Defendants Perez and Alexander.

154.    She was not allowed to freely leave, and she was asked questions by Defendants Perez and Alexander.

155.    There was no probable cause or reasonable suspicion justifying her detention.

156.    From the moment police made contact with Ms. Quintana, Ms. Quintana was cooperative.

157.    When Ms. Quintana asked to use the restroom, she was escorted by Defendant Perez who advised Ms. Quintana that if she ran, Defendant Perez, an armed female police officer, would tackle Ms. Quintana.

158.    There were no exigent circumstances that would justify her detention.

159.    The acts and omissions of the unknown officers performed under the color of law, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Ms. Quintana's federally protected rights.

160.    The acts and omissions of Defendants Perez and Alexander were pursuant to the custom, policy, or practice of Denver, which encourages, condones, tolerates, and ratifies the use of unlawful seizure and deprivation of constitutionally protected interests by law enforcement officers.

161.    The acts or omissions of Defendants Perez and Alexander, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Ms. Quintana's damages.

162.    As a direct result of Defendant Perez's and Alexander's unlawful actions as described above, Ms. Quintana suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment Unlawful Seizure (City and County of Denver, Pazen, Dodge, Eberharter, and Kohls)**

163.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

164.    Defendants' acts and conduct in seizing and destroying Ms. Quintana's property was a meaningful interference in Ms. Quintana's possessory interest in her property and her personal effects.

165.    The acts and omissions of Defendants performed under the color of law, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Ms. Quintana's federally protected rights.

166.    The acts and omissions of Defendants were pursuant to the custom, policy, or practice of Denver, which encourages, condones, tolerates, and ratifies the seizing and destruction of property, and deprivation of constitutionally protected interests by law enforcement officers.

167.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Ms. Quintana's damages.

168.     As a direct result of the Defendants' unlawful actions as described above, Ms. Quintana suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process/Excessive Force (City and County of Denver, Pazen, Dodge, Eberharter, and Kohls)**

169.     Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

170.     While operating under the color of law, Defendants' use of fire-producing grenades that were rated for outdoor use was an arbitrary governmental action, taken without due process.

171.     Defendants had other non-flammable chemical agents they could have deployed.

172.     Instead, Defendants chose and implemented a plan to use flammable chemical agents that the manufacturer warned should not be used indoors.

173.     Defendant Eberharter's decision to blindly throw the flammable burn boxes into Ms. Quintana's house was objectively unreasonable.

174.     Defendants actively participated in the excessive force by developing plans, having those plans approved by decisionmakers, securing fire-producing chemical agents in metal boxes, and throwing the metal boxes into Plaintiff's home.

175.     Furthermore, each individual Defendant failed to intervene to prevent each other from using excessive force.

176.     Their excessive use of force resulted in the burning of Plaintiff's home and personal effects.

177.    Their excessive use of force resulted in Plaintiff becoming homeless.

178.    The force used by Defendants was inspired by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience, particularly when Defendants had less excessive alternatives.

179.    The acts and omissions of the Defendants performed under the color of law, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Ms. Quintana's federally protected rights.

180.    The acts and omissions of the Defendants were pursuant to the custom, policy, or practice of Denver, which encourages, condones, tolerates, and ratifies the use of excessive force, violations of due process, and deprivation of constitutionally protected interests by law enforcement officers.

181.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Ms. Quintana's damages.

182.    As a direct result of the Defendants' unlawful actions as described above, Ms. Quintana suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**

**42. U.S.C. § 1983 – Failure to Train and Supervise (City and County of Denver)**

183.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

184.    Individual defendants reported that their acts and conduct were sanctioned by persons with authority to make policy decisions on behalf of Denver. Chief Pazen indicated that he would monitor the situation and he would have control.

185.    As the METRO SWAT sergeant directing the use of chemical munitions, Defendant Dodge oversaw the use of flammable chemical munitions that are specifically and conspicuously rated for outdoor use to be thrown into Ms. Quintana's home.

186.    The Tenth Circuit Court of Appeals has repeatedly warned law enforcement on the use of incendiary devices, particularly where an officer detonates the device carelessly. *Santistevan v. City of Colo. Springs*, 983 F.Supp.2d 1295, 1320-21 (D.Colo. 2013).

187.    Despite this admonition, Denver failed to properly train, supervise, and discipline its employees, with respect to unlawful seizure, excessive force, and the due process rights of residents.

188.    Despite this admonition, Denver has failed to develop policies, procedures, training manuals, or guidelines involving the use of flammable chemical munitions inside of buildings, such as personal residences.

189.    As confirmed by Denver, it does not have training manuals, policies, rules, or regulations involving deploying fire-producing chemical agents through the use of "burn boxes" in indoor settings.

190.    Denver's failure to adequately train, supervise, discipline, and investigate its officers with respect to the illegal seizure and detention of individuals, excessive force, and due process rights of residents is a custom, policy, or practice of Denver and a driving force behind the constitutional violations described herein.

191.    Yet, persons with decision making authority authorized the use of flammable chemical ordinance, rated for outdoor use, to be used inside of Ms. Quintana's home, which resulted in the burning of her home.

192.    Denver's policy of inaction in light of notice that its policies and customs amounts to deliberate indifference to the rights of persons, is the functional equivalent of a decision by the city itself to violate the Constitution.

193.    Denver also has a culture of tolerating excessive force, unlawful seizure, and violating due process by its law enforcement officers. Denver failed to discipline, train, and supervise the individual Defendants concerning the Fourth and Fourteenth Amendments, the use of excessive force, the seizure of people and property, and due process rights of residents.

194.    Over the years, Denver has settled numerous excessive force, illegal seizure, failure to train, and failure to supervise complaints in the amount of millions of taxpayer dollars.

195.    The constitutional violations against and harming Ms. Quintana was a foreseeable consequence of Denver's actions and inactions.

196.    Denver was deliberately indifferent to the constitutional rights of its residents by failing to properly train, monitor, supervise, and discipline employees with respect to excessive force, unlawful seizure, and due process. Denver could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

197.    Denver's policies, customs, or practices in failing to properly monitor, train, supervise, and discipline its employees were the moving force and proximate cause of the violations of Ms. Quintana's constitutional rights.

198. The acts or omissions of Denver, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Ms. Quintana's damages.

199. The acts or omissions of Denver as described herein deprived Ms. Quintana of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused her other damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against each of the Defendants, and award her all the relief allowed by law, including but not limited to the following:

A. All appropriate relief at law and equity;

B. Declaratory relief and other appropriate equitable relief;

C. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

D. Punitive damages on all claims allowed by law and in an amount to be determined at trial;

E. Attorney's fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

F. Pre- and post-judgment interest at the appropriate lawful rate; and

G. Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 6th day of April, 2020.

SALAZAR LAW, LLC

*Duly signed original on file at the offices of Salazar Law, LLC*

*By; /s/Joseph A. Salazar*
Joseph A. Salazar, Reg. No. 35196
Salazar Law, LLC
PO Box 370
Eastlake, CO 80614-0370
(303) 895-7044 – Office

Attorney for Plaintiff Mary Quintana

## <u>CERTIFICATE OF SERVICE</u>

On this 6th day of April, 2020, the foregoing First Amended Complaint was filed using the CM/ECF system with notice and service provided to the following:

City and County of Denver
Michele Horn
David Cooperstein
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202
Telephone (720) 913-3129
michele.horn@denvergov.org
David.cooperstein@denvergov.org

Counsel for Defendants


*/s/Joseph A. Salazar*
Joseph A. Salazar