**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-0214-WJM-KLM

MARY QUINTANA,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
POLICE CHIEF PAUL PAZEN, in his individual and official capacities,
JUSTIN DODGE, in his individual and official capacities,
RICHARD EBERHARTER, in his individual and official capacities,
BRENT KOHLS, in his individual and official capacities,
MARDIE PEREZ, in her individual and official capacities, and
MYRON ALEXANDER, in his individual and official capacities,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

---

This civil rights action arises out of an armed standoff between Plaintiff Mary Quintana's son and Denver Police Department ("DPD") officers, which resulted in two officers being shot and Plaintiff's house being burned down.   (ECF No. 21.)   Plaintiff sues the City and County of Denver ("Denver"), as well as Defendants Paul Pazen, Justin Dodge, Richard Eberharter, Brent Kohls, Mardie Perez, and Myron Alexander in their individual and official capacities (collectively, the "Individual Defendants") for negligence and various constitutional violations under 42 U.S.C. § 1983.   (*Id.*)

This matter is before the Court on Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ("Motion").   (ECF No. 24.)   For the reasons explained below, the Motion is granted in part and denied in part.

## I.   BACKGROUND

The following factual summary is drawn from Plaintiff's First Amended Complaint and Jury Demand ("Amended Complaint") (ECF No. 21), except where otherwise stated.   The Court assumes the allegations contained in the Complaint are true for the purpose of deciding the Motion.   *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

### A.   The Initial Armed Standoff

On January 27, 2019 at 11:41 a.m., the DPD received a call about shots being fired around 6th Avenue and Inca Street in Denver, Colorado, and dispatched DPD officers to investigate the call.   (¶ 23.)[1]   The DPD officers who responded to the call found at least one spent ammunition cartridge outside Plaintiff's home at 622 Inca Street (the "Residence").   (¶ 24.)   They also discovered that Plaintiff's son, Joseph Quintana ("J. Quintana"), had a warrant for his arrest and may be residing in the Residence.   (¶ 25.)

DPD officers contacted Plaintiff, who was not home at the time but voluntarily met them outside the Residence at around 1:00 p.m.   (¶¶ 27–29.)   Plaintiff was unaware whether J. Quintana was in her home at the time, but she gave DPD officers permission to enter the Residence.   (¶¶ 30–31.)   Plaintiff's second son, Phillip Quintana ("P. Quintana"), unlocked the door for the DPD officers, who "pushed P. Quintana aside and burst into the [Residence]."   (¶¶ 29, 33–34.)   P. Quintana waited outside while DPD officers inspected the Residence.   (¶ 25.)

---

[1]   Citations to paragraph numbers, without more, *e.g.* (¶__), are to paragraphs in the Amended Complaint.   (ECF No. 21.)

2

DPD officers found J. Quintana in the basement of the Residence.   (¶ 37.)
They ordered J. Quintana to exit the basement, but instead he opened fire, hitting one
DPD officer in the Kevlar vest around his abdomen.   (¶¶ 37–39.)   DPD officers
returned fire into the basement.   (¶ 40.)   After pulling the wounded DPD officer to
safety, the DPD officers "retreated from the [Residence] to the front of the house."   (¶¶
40, 42.)   Thereafter, "more shots came from inside the home and a bullet struck a
second [DPD] officer in the leg."   (¶ 43.)

Within minutes after the two DPD officers were shot, dozens of DPD
officers—including Metro SWAT members—descended on the house and took positions
around the perimeter of Plaintiff's home.   (¶¶ 45–46.)   Over the course of the next
several hours, J. Quintana remained in the Residence while DPD officers "attempted to
convince him to leave the [R]esidence and surrender."   (¶ 50.)

## B.    DPD's Use of Chemical Agents

At some point during the standoff, Metro SWAT officers devised a plan to use
chemical agents to force J. Quintana to leave the Residence.   (¶¶ 59–60.)   Defendant
Pazen, the DPD chief of police, "issued orders to individual Defendants, and/or agreed
to strategies and plans involving the use of flammable chemical ammunition, specifically
and conspicuously rated for outdoor use, to be fired into or thrown into" the Residence.
(¶¶ 51, 61.)   "With [Metro] Command and the Command Post's approval, Defendant
Dodge, as a sergeant, was given authority as a decisionmaker to use flammable
chemical agents, specifically and conspicuously rated for outdoor use, inside of [the
Residence]."   (¶ 64.)

3

Thereafter, between 4:32 p.m. and 5:27 p.m., Defendants Kohls and Eberharter prepared and threw chemical agents into the Residence.  (¶¶ 68, 74, 78.)   These chemical agents included: (1) at least one round of "flameless" chemical agent; and (2) "several rounds of flammable chemical agents," which were thrown into the Residence inside vented metal boxes known as "burn boxes."   (¶¶ 69–71.)   These burn boxes were "just randomly thrown inside the house without any care for placement or whether the boxes would land near flammable materials."   (¶ 79.)

At around 5:27 p.m., the Residence caught fire.   (¶ 80.)   Metro SWAT prohibited Denver Fire Department ("DFD") from fighting the fire; instead, Metro SWAT officers—who are not trained as firefighters—fought the fire until it was confirmed that J. Quintana had been arrested.   (¶¶ 81–83.)   The fire destroyed a significant portion of the Residence, rendering Plaintiff homeless.   (¶¶ 84, 86.)

The DFD later investigated the source of the fire.   (¶ 87.)   They observed that a "CN/CS grenade within a burn box 'was observed on the metal frame of the futon, at the northwest corner.'"   (¶ 88.)   The DFD concluded that the CN/CS grenade was the probable ignition source for the fire.   (¶¶ 89–90.)   Documents from Defense Technology, the CN/CS grenade's manufacturer, specifically state that the CN/CS grenade is "[d]esigned specifically for outdoor use in crowd control situations" and "should NOT be deployed onto rooftops, in crawl spaces, or indoors due to its fire-producing capability."   (¶ 93.)

## C.  Plaintiff's Detention

After Plaintiff voluntarily drove to the Residence at DPD's request at around 1:00

p.m. and let DPD into the Residence, DPD officers took Plaintiff to an area about a block away from her house and placed her inside a police vehicle and in the custody of Defendants Perez and Alexander.   (¶¶ 99–100, 102–03.)   Plaintiff was not allowed to leave the vehicle without an armed police officer for the next five hours.   (¶ 104.) Defendants Perez and Alexander asked Plaintiff constant questions about J. Quintana, which she answered to the best of her ability.   (¶¶ 105–06, 154.)   Although Plaintiff repeatedly asked to speak with her son to "talk him out of the house," DPD denied her requests.   (¶¶ 107–08.)   During this time, Plaintiff felt like a prisoner and "knew that she was not free to leave at any point."   (¶ 112.)

At approximately 6:58 p.m., an hour and a half after J. Quintana was placed into DPD custody, the DPD released Plaintiff.   (¶ 113.)

**D.     The Instant Action**

Plaintiff filed this action on January 27, 2020 (ECF No. 1) and filed the Amended Complaint on April 27, 2020 (ECF No. 21).   Plaintiff asserts: (1) Dodge, Eberharter, and Kohls acted negligently and negligently per se by throwing flammable chemical munitions into the Residence (¶¶ 135–151); (2) Denver, Perez, and Alexander unlawfully seized Plaintiff in violation of the Fourth Amendment (¶¶ 152–61); (3) Denver, Pazen, Dodge, Eberharter, and Kohls unlawfully seized Plaintiff's property in violation of the Fourth Amendment (¶¶ 163–68); (4) Denver, Pazen, Dodge, Eberharter, and Kohls violated Plaintiff's right to Due Process under the Fourteenth Amendment (¶¶ 169–82); and (5) Denver failed to train and supervise its officers (¶¶ 183–99).

Defendants filed the Motion on May 7, 2020.   (ECF No. 24.)   Plaintiff responded

on September 22, 2020 (ECF No. 58), and Defendants replied on October 20, 2020 (ECF No. 67).

## II.   LEGAL STANDARD

### A.      Federal Rule of Civil Procedure 12(b)(1)

As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear.   *See* U.S. Const. art. III, § 2; *Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994).   Statutes conferring jurisdiction on federal courts must be construed strictly.   *See F&S Constr. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964).

Federal Rule of Civil Procedure 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter."   A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusionary allegations of jurisdiction."   *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).   A party challenging the Court's jurisdiction may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends.   *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).   When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations.   *See id.*   A court has wide discretion to allow affidavits, other documents, and may conduct a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). *See id.*

B.      **Federal Rule of Civil Procedure 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a

claim in a complaint for "failure to state a claim upon which relief can be granted."   In

reviewing a motion to dismiss under Rule 12(b)(6), the Court will "assume the truth of

the plaintiff's well-pleaded factual allegations and view them in the light most favorable

to the plaintiff."   *Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177.   "[T]o withstand a

motion to dismiss, a complaint must contain enough allegations of fact 'to state a claim

to relief that is plausible on its face.'"   *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th

Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).   This means

that "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter

(taken as true) to suggest' that he or she is entitled to relief.   'Factual allegations must

be enough to raise a right to relief above the speculative level.'"   *Id.* (quoting *Twombly,*

550 U.S. at 545 & 556).   The plaintiff "does not need detailed factual allegations" but

must plead more than merely "labels and conclusions" or "a formulaic recitation of the

elements of a cause of action."   *Id.*   "[A] well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of those facts is improbable, and that a recovery

is very remote and unlikely."   *Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177 (quoting

*Twombly*, 550 U.S. at 556).

### III.   ANALYSIS

A.      **Claims One and Two: Negligence and Negligence Per Se**

Plaintiff brings negligence and negligence per se claims against Defendants

Dodge, Eberharter, and Kohls based on their use of CN/CS grenades inside the

Residence.[2]   (¶¶ 135–51.)   Specifically, Plaintiff alleges that "Defendants were aware that the fire-producing grenades they prepared and threw into [Plaintiff's] home were specific for outdoor use and were not to be used indoors," and that "Defendants' acts and conduct were willfully and wantonly committed, which they knew was dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly [Plaintiff]."   (¶¶ 136, 143.)   Defendants move to dismiss Plaintiff's negligence and negligence per se claims under Rule 12(b)(1), arguing that they are immune from suit under the Colorado Government Immunity Act ("CGIA"). (ECF No. 24 at 6–9.)

"A public employee is immune from liability on tort claims arising out of an act or omission of the employee during the performance of his or her duties and within the scope of his or her employment, unless the act or omission causing such injury was willful and wanton."   *Carothers v. Archuleta Cnty. Sheriff*, 159 P.3d 647, 650 (Colo. App. 2006) (citing Colo. Rev. Stat. § 24-10-118).   Colorado courts have adopted the definition of "willful and wanton conduct" from Colorado's exemplary damages statute, which defines it as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or the rights and safety of others, particularly the plaintiff."   Colo. Rev. Stat. § 13-21-102(1)(b); *Drake v. City & Cnty. of Denver*, 953 F. Supp. 1150, 1160 (D. Colo. 1997); *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994) (en banc).

---

[2]   The negligence per se claim is predicated on Colorado Revised Statute § 18-4-105, which provides that "[a] person who knowingly or recklessly starts or maintains a fire or causes an explosion, on his own property or that of another, and by so doing places another in danger of death or serious bodily injury or places any building or occupied structure of another in danger of damage commits fourth degree arson."

8

Plaintiff argues the CGIA does not bar her negligence claims because the "Individual Defendants' actions of deploying flammable chemical munitions inside of Plaintiff's home was willful and wanton."   (ECF No. 58 at 6.)   Among other things, Plaintiff cites the following facts in support of her contention that the Individual Defendants' conduct was willful and wonton:

- Defense Technologies' product specifications state that the CN/CS grenades "should NOT be deployed indoors due to its fire-producing capabilities" (*id.* at 7);

- In response to Plaintiff's discovery requests, Denver represented that it could not locate information related to specific training courses or written training matters that the Individual Defendants received involving the use of flammable CS grenades inside of buildings or the use of burn boxes (*id.* at 6–7);

- Defendant Dodge admitted that Defendants had access to other "non-pyrotechnic munitions" during the armed standoff (ECF No. 58-4 at 7, ¶ 7) and recognized that "there is a risk of fire in deploying a CS pyrotechnic munition within a structure, however, with the munition enclosed within a burn box he believed that it was highly unlikely that it would cause a fire" (*id.* at 12, ¶ 5); and

- Defendant Eberharter admitted that "he was unable to look into the home while deploying the final burn box because the threat posed by [J.] Quintana" (ECF No. 58-7 at 13 ¶ 10).

Defendants argue that the Individual Defendants' conduct was not negligent—let alone undertaken in reckless disregard of the safety of others—based on the fact that the grenades "had been used widely without causing structure fires, and the SWAT team took steps to mitigate any risk of fire by encasing the munitions within burn boxes." (ECF No. 24 at 8.)   In support, Defendants provided a declaration from Adam Giggey, a technician for the DPD's Metro SWAT unit, who stated that "deployment of CS grenades within burn boxes inside of a structure is a nationwide best practice amongst SWAT

9

teams when confronted with an armed, barricaded suspect who is unresponsive to negotiation attempts" and that "[a]part from the incident on January 27, 2019, at [the Residence], I have neither personally observed nor heard secondhand of a CS grenade deployed within a burn box causing fire damage to a structure."   (ECF No. 24-4 at 2, ¶¶ 4–5.)   Moreover, Defendants contend that their decision to use burn boxes "cannot be viewed in a vacuum—the Defendants were faced with an armed, barricaded suspect who had already shot two officers and was unresponsive to negotiation attempts." (ECF No. 24 at 8.)   Thus, according to Defendants, "[u]se of the chemical agents represented a far safer alternative for bringing Plaintiff's son into custody than attempting to enter her home for the second time," and the fact that a fire broke out "does not transform the SWAT team's reasonable actions into willful and wanton conduct."   (*Id.*)

It may be true that Defendants' use of flammable grenades was the least dangerous alternative available to DPD to end the armed standoff with J. Quintana. However, whether the armed standoff justified Defendants' use of the flammable munitions is not for the Court to decide today.   Plaintiff has plausibly alleged that Defendants were on notice that the flammable CN/CS grenades were not designed for indoor use, but nonetheless heedlessly used the grenades.   Such allegations are sufficient to establish a claim that Defendants' conduct was willful and wanton under Colorado law.[3]   Accordingly, the CGIA does not bar Plaintiff's negligence and negligence per se claims against Defendants Dodge, Eberharter, and Kohls .

---

[3] For the same reasons, the Court finds that Plaintiff has plausibly alleged that Defendants Dodge, Eberharter and Kohls recklessly started a fire by consciously disregarding the associated risks, as required for Plaintiff's negligence per se claim.

**B.      Official Capacity Claims Against the Individual Defendants**

Plaintiff sues the Individual Defendants in both their individual and official

capacities.   (ECF No. 21 at 1.)   Defendants seek dismissal of the official capacity

claims against the Individual Defendants, arguing that they are duplicative of Plaintiff's

claims against Denver.

"[A]n official capacity suit is, in all respects other than name, to be treated as a

suit against the entity."   *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Couser v. Gay*,

959 F.3d 1018, 1023 (10th Cir. 2020) (recognizing that official capacity suits "impose[ ]

liability on the entity that [the sued public servant] represents" (quoting *Brandon v. Holt*,

469 U.S. 464, 471 (1985)).   Because Plaintiff has named Denver in each of the

constitutional claims brought against the Individual Defendants under § 1983 (*see*

¶¶ 150–82), these official capacity claims are duplicative of Plaintiff's claims against

Denver and must be dismissed.

**C.      Constitutional Claims Against the Individual Defendants**

1.      Qualified Immunity Standard

"Individual defendants named in a § 1983 action may raise a defense of qualified

immunity, which shields public officials . . . from damages actions unless their conduct

was unreasonable in light of clearly established law."   *Gutierrez v. Cobos*, 841 F.3d

895, 899 (10th Cir. 2016) (internal quotation marks omitted).   "Once the qualified

immunity defense is asserted," as the Individual Defendants have done here, "the

plaintiff bears a heavy two-part burden to show, first, the defendant[s'] actions violated a

constitutional or statutory right, and, second, that the right was clearly established at the

time of the conduct at issue." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 211 (2017). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"In this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Gutierrez*, 841 F.3d at 900 (internal quotation marks omitted). "A plaintiff need not show the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (internal quotation marks omitted). But "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it." *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted).

"The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Therefore, a plaintiff may not defeat qualified immunity "simply by alleging violation of extremely abstract rights."

*White v. Pauly*, 137 S. Ct. 548, 552 (2017).   Nonetheless, the clearly established

inquiry "involves more than a scavenger hunt for prior cases with precisely the same

facts.   The more obviously egregious the conduct in light of prevailing constitutional

principles, the less specificity is required from prior case law to clearly establish the

violation."   *Perea v. Baca,* 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation

marks and citation omitted).

Because qualified immunity is immunity from suit, rather than a mere defense to

liability, *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016), a court may

dismiss the case with or without prejudice if it finds that a defendant is subject to

qualified immunity.   *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232

F.3d 1334, 1342 (10th Cir. 2000).

    2.   <u>Claim Three: Fourth Amendment Seizure of Plaintiff</u>

Plaintiff brings a Fourth Amendment claim against Defendants Perez and

Alexander arising from Plaintiff's 6-hour detention during the armed standoff between

DPD and J. Quintana.   (¶¶152–62.)   The Court will assume, for purposes of this Order

only, that Plaintiff has adequately pled a Fourth Amendment claim arising from the

Individual Defendants' seizure of Plaintiff and will turn to whether qualified immunity

applies.

The Court has discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first.   *See Pearson*, 555 U.S. at 236.

Considering the circumstances of this case, the Court finds that the second

prong—whether the constitutional right was clearly established at the time of the

Individual Defendants' unlawful conduct—should be addressed first.

The Individual Defendants argue that the defense of qualified immunity applies because Plaintiff has failed to demonstrate that the Individual Defendants acted in contravention of clearly established law in detaining Plaintiff.   (ECF No. 24 at 14.)

In response, Plaintiff argues that her detention is similar to the detention of the Tina Cortez in *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007).   In *Cortez*, after hearing unsubstantiated allegations that Ms. Cortez's husband may have molested a child, law enforcement entered the plaintiffs' house without a warrant, escorted Ms. Cortez from the home, placed her into a patrol vehicle, and questioned her in the back seat of a locked patrol vehicle.   *Id.* at 1113–14, 1122.   The Tenth Circuit concluded that Ms. Cortez demonstrated that her "clearly established constitutional right has been violated" as a result of law enforcement's decision to conduct an investigatory detention that was not supported by exigent circumstances.   *Id.* at 1123.

Although the clearly established inquiry is not intended to be a "scavenger hunt for prior cases with precisely the same facts," *Perea,* 817 F.3d at 1204, *Cortez* does not establish that the *particular conduct* at issue in this litigation was clearly established at the time Officers Perez and Alexander detained Plaintiff.   This case, unlike *Cortez*, involved an exigent situation in which the Individual Defendants and J. Quintana were engaged in an active armed standoff inside Plaintiff's house, the shooting of two DPD officers, and a fire.[4]   Although it is undisputed that Plaintiff was neither under arrest nor

---

[4] The Court recognizes that Plaintiff alleges that "[t]here were no exigent circumstances that would justify her detention."   This conclusory allegation is contradicted, however, the Plaintiff's other allegations in the Amended Complaint.   *See, e.g., Linton v. Comm'r of Internal Revenue*, 764 F. App'x 674, 679 (10th Cir. 2019) (recognizing that a court is not bound by [the plaintiff's] conclusory allegations, unwarranted inferences, or legal conclusions" on a Rule

suspected of engaging in any crime when she was detained, Plaintiff has not established that the violation of her rights were clearly established in light of the unfolding exigent situation and her status as an witness with pertinent information.   *Cf. Chivers v. Reaves*, 2017 WL 4296726, at *30 (D. Utah Sept. 26, 2017), *aff'd*, 750 F. App'x 769 (10th Cir. 2019) (recognizing that it "strains credulity to insist that any officer was required to turn [p]laintiff out into the cold and allow her to wander into the police milieu surrounding an active standoff with an armed, severely intoxicated suspect who had already fired at police").

Because Plaintiff has not demonstrated that the Defendants Perez and Alexander violated a clearly established right by detaining Plaintiff, she has not met her burden to overcome the defense of qualified immunity.   Accordingly, Claim Four is dismissed against the Officers Perez and Alexander without prejudice.

3.    Claim Four: Fourth Amendment Seizure of the Residence

Plaintiff brings a Fourth Amendment claim for unlawful seizure against Defendants Pazen, Dodge, Eberharter, and Kohls for their roles in seizing and destroying the Residence.   (¶¶ 163–67.)

i.    *Whether Plaintiff has Adequately Pled a Fourth Amendment Claim*

The Individual Defendants argue that Plaintiff has not stated a valid Fourth Amendment claim relating to their seizure of the Residence because Plaintiff "does not allege that any of the [Individual Defendants] intended to seize or burn her home." (ECF No. 24 at 15.)

In *Brower v. County of Inyo*, 489 U.S. 593 (1989), the Supreme Court recognized

---

12(b)(6) motion (quoting *Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994)).

that a "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower*, 489 U.S. at 596.   Although a "seizure occurs even when an unintended person or thing is the object of the detention or taking," the "detention or taking itself must be willful." *Id.*   The Supreme Court provided the following example illustrating this principle:

> Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment.   And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant—even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables.   It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied.
>
> . . .
>
> In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg.   We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

*Id.* at 596–99.   "In sum, the Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct."   *Id.* at 596 (internal citations omitted).

16

Courts applying this principle have determined that actions by law enforcement officers that unintentionally seize a person or thing do not violate the Fourth Amendment even when the underlying conduct was intentional.   For example, in *Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000), the Tenth Circuit determined that officers did not "seize" hostages held by escaped inmates in the hostages' vehicle when officers, with knowledge of the hostages' presence, fired upon the vehicle at a roadblock and accidentally struck the hostages.   *Id.* at 1157.   Because the "officers intended to restrain the minivan and the fugitives, not [plaintiffs]," the "injuries inflicted were the unfortunate but not unconstitutional 'accidental effects of otherwise lawful conduct.'"   *Id.* (quoting *Brower*, 489 U.S. at 596); *see also Bublitz v. Cottey*, 327 F.3d 485, 489 (7th Cir. 2003) (finding that officers' actions in using a tire-deflation device to stop a fleeing robbery suspect, which subsequently caused an accident injuring an innocent driver and killing driver's wife and child, did not constitute a "seizure" under the Fourth Amendment); *Rucker v. Harford Cnty., Md.*, 946 F.2d 278, 279 (4th Cir. 1991) (holding that no seizure occurred when officers wounded a bystander in an attempt to shoot the tires of a fugitive's car).

Here, Plaintiff has alleged that the Individual Defendants intentionally prepared and fired flammable and flameless chemical agents into the Residence.   (¶¶ 68–71, 165.)   However, this intentional conduct does not transform the Individual Defendants' conduct into a Fourth Amendment seizure where Plaintiff has not alleged that the Individual Defendants intended to seize the Residence itself.   Because Plaintiff has not alleged that the Individual Defendants' conduct was set in motion or put in place to

17

achieve a seizure of the Residence itself, Plaintiff has not stated a Fourth Amendment claim.

ii.    *Whether the Defense of Qualified Immunity Applies*

Even assuming that Plaintiff had plausibly alleged a Fourth Amendment claim, the Court finds that the defense of qualified immunity would apply because Plaintiff has not demonstrated that that the Individual Defendants' actions violated clearly established law.

Defendants represent they are unaware of any Tenth Circuit authority "recognizing a Fourth Amendment cause of action on behalf of third parties whose property is damaged during efforts to apprehend a criminal suspect."   (ECF No. 24 at 15.)

In response, Plaintiff cites the Fourth Amendment and *United States v. Jacobsen*, 466 U.S. 109 (1984) for the general proposition that a "'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."   *Jacobsen*, 466 U.S. at 113.   These propositions, which define Plaintiff's rights "at a high level of generality," do not demonstrate that the violative nature of the Individual Defendants' particularized conduct was clearly established.   *See White*, 137 S. Ct. at 552 (recognizing that an alternate approach would allow plaintiffs to convert the rule of qualified immunity "into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights").

The other cases Plaintiff cites suggest that law enforcement *may* violate the Fourth Amendment depending on the police tactics used.   *See Santistevan v. City of*

18

*Colorado Springs*, 983 F. Supp. 2d 1295, 1319 (D. Colo. 2013) (recognizing that officers' use of "commando-style tactics" may "run the risk of violating the Fourth Amendment" but holding that "the Court cannot find that Sergeant Krammer violated clearly established law by deciding to use a SWAT team in this case to make a dynamic entry into Plaintiff's residence"); *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997) (recognizing that the "use of a 'flashbang' device in a house where innocent and unsuspecting children sleep gives us great pause," but ultimately determining that "we cannot say that their actions were objectively unreasonable" under the Fourth Amendment); *Pauly v. White*, 814 F.3d 1060 (10th Cir. 2016), *vacated*, 137 S. Ct. 548 (2017) (recognizing that the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").   These cases do not demonstrate that the "violative nature [the Individual Defendants'] *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12 (emphasis in original).

Finally, Plaintiff argues that "[e]ven in the circumstances of a barricaded suspect, a reasonable officer would know that burning down Plaintiff's home to apprehend a suspect would be unlawful in the situation he confronted" such that the Individual Defendants should have been on notice that their conduct violated established law despite the novel circumstances.   (ECF No. 58 at 17.)   As an initial matter, this description mischaracterizes Plaintiff's pleading of the factual events.   Plaintiff does not allege that the Individual Officers intentionally burned down the Residence to capture J. Quintana.   Instead, the question is whether a reasonable officer should recognize that

they would violate the Fourth Amendment by damaging a third party's property while attempting to apprehend a criminal suspect.   The Court cannot say a reasonable officer should have made this determination.[5]

Because Plaintiff has not demonstrated that the Individual Defendants violated a clearly established right, Plaintiff has not met her burden to overcome the defense of qualified immunity.   Accordingly, Claim Four is dismissed against Defendants Pazen, Dodge, Eberharter, and Kohls with prejudice.

> 4.   <u>Claim Five: Fourteenth Amendment Due Process / Excessive Force Claim</u>

Plaintiff asserts a "Fourteenth Amendment Due Process / Excessive Force" claim against Defendants Pazen, Dodge, Eberharter, and Kohls.   (¶¶ 169–82.)   Plaintiff alleges that "while operating under the color of law, Defendants' use of fire-producing grenades that were rated for outdoor use was an arbitrary governmental action, taken without due process."   (¶ 170.)   She further alleges that "Defendants actively participated in the excessive force by developing plans, having those plans approved by decisionmakers, securing fire-producing chemical agents in metal boxes, and throwing the metal boxes into Plaintiff's home," which resulted in the destruction of the Residence and Plaintiff's personal effects.   (¶¶ 174, 176.)

> i.   *Whether Plaintiff has Adequately Pled a Fourteenth Amendment Procedural Due Process Claim*

Defendant argues that to the extent Plaintiff alleges a procedural due process

---

[5]   For example, in a case decided after the events giving rise to this lawsuit, the Tenth Circuit held that police officers' destruction of a home while attempting to apprehend criminal suspect barricaded inside home was not a compensable taking under the Takings Clause, even though homeowners were innocent.   *See Lech v. Jackson*, 791 F. App'x 711, 718–19 (10th Cir. 2019), *cert. denied,* 141 S. Ct. 160 (2020).

claim, this claim must be dismissed because Plaintiff has an adequate state law remedy.   (ECF No. 24 at 18.)   The Court agrees.

A procedural due process claim is precluded by the existence of an adequate post-deprivation remedy.   *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984).   As Plaintiff has plausibly alleged that Defendants' decision to deploy flammable munitions inside of the Residence was willful and wanton, Plaintiff already "has an adequate post-deprivation remedy" in the form of a tort claim because Colorado public employees "are 'not immune from liability' for tortious activities that are 'willful and wanton.'"   *Cary v. Goodrich*, 820 F. App'x 681, 683–84 (10th Cir. 2020) (dismissing due process claim where plaintiff possessed adequate post-deprivation remedies); Colo. Rev. Stat. § 24-10-118.

Thus, the Court grants the Motion to the extent it seeks dismissal of a procedural due process claim without prejudice.

ii.   *Whether Plaintiff has Adequately Pled a Fourteenth Amendment Substantive Due Process Claim*

To state a substantive due process claim, Plaintiff must plausibly allege that she was deprived of her property "in a manner so arbitrary as to shock the judicial conscience."   *Lindsey v. Hyler*, 918 F.3d 1109, 1115 (10th Cir. 2019).   Plaintiff's pleadings do not meet this standard.

In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Supreme Court analyzed whether the parents of a motorcyclist killed in a high-speed police chase could bring a substantive due process claim under the Fourteenth Amendment.   Recognizing that "due process guarantee does not entail a body of constitutional law imposing

liability whenever someone cloaked with state authority causes harm," the Supreme

Court stated that "conduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the

conscience-shocking level." *Id.* at 848–89.   The *Lewis* Court then acknowledged that

police officers often must make decisions under high-pressure scenarios and held that

> [i]n the circumstances of a high-speed chase aimed at
> apprehending a suspected offender, where unforeseen
> circumstances demand an instant judgment on the part of an
> officer who feels the pulls of competing obligations, only a
> purpose to cause harm unrelated to the legitimate object of
> arrest will satisfy the shocks-the-conscience test.

*Id.* at 834.   The Tenth Circuit has subsequently stated that "[w]hen an officer is in a

high-pressure situation where time is of the essence, there must be evidence of a

purpose to cause harm unrelated to the legitimate object of the arrest to satisfy the

element of arbitrary conduct shocking to the conscience for a due process violation."

*Ellis ex rel. Estate of Ellis v. Ogden City*, 589 F.3d 1099, 1102 (10th Cir. 2009).

Here, Plaintiff's allegations in the Amended Complaint demonstrate that the

Individual Defendants encountered an exigent and high-pressured situation on January

27, 2019 resulting from an armed standoff with an individual who had barricaded himself

in the Residence after shooting two DPD officers.[6]   Although Plaintiff has alleged facts

---

[6] In *Doe v. Heil*, 533 F. App'x 831 (10th Cir. 2013), the Tenth Circuit recognized that "where governmental actors . . . have time for reflection and are not operating under exigent, pressurized circumstances—such as exist during a prison riot or a police car chase—they may be subjected to substantive due process liability for operating with deliberate indifference, rather than a more culpable mental state like an intent to harm." 533 F. App'x at 844.   However, because Plaintiff's pleadings suggest that Defendants were operating under exigent circumstances without time for extensive deliberation, the Court analyzes whether Plaintiff has alleged facts under the intent to harm standard rather than the deliberate indifference standard. *See Perez v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 432 F.3d 1163, 1167 (10th Cir. 2005) (recognizing that the "intent to harm standard is not limited to situations calling for split-second reactions" but instead applies "whenever decisions must be made in haste, under

suggesting that the Individual Defendants' decision to throw flammable munitions into the Residence was reckless, Plaintiff has not alleged that the Individual Defendants *intended* to cause a fire at the Residence, *i.e.*, intended to cause harm unrelated to the legitimate arrest of J. Quintana.   *See Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998) (applying *Lewis* and dismissing due process claim brought on behalf of innocent bystander killed during police struggle with a suspect).   Accordingly, the Court finds that Plaintiff has not plausibly alleged arbitrary conduct shocking to the conscience, and Plaintiff's substantive due process claim is dismissed without prejudice.

iii.    *Whether the Defense of Qualified Immunity Applies*

Moreover, even assuming that Plaintiff had plausibly alleged a Fourteenth Amendment claim, the Court still finds that the defense of qualified immunity applies.

The Individual Defendants argue that "in the absence of any prior, similar case in which the Tenth Circuit or Supreme Court has determined that incidental property damage caused by a chemical agent used by officers to effectuate an arrest could rise to the level of a procedural or substantive due process violation," Plaintiff has not demonstrated a violation of clearly established law.   (ECF No. 24 at 20.)

In response, Plaintiff argues that the Tenth Circuit telegraphed in *Lech v. Jackson* "that law enforcement's excessive zeal to root out [a] barricade[d] suspect by destroying an innocent's person's home is subject to constitutional scrutiny under the Due Process Clause of the United States Constitution.   (ECF No. 58 (citing *Lech*, 791 F. App'x at 719).)

---

pressure, and frequently without the luxury of a second chance").

In *Lech*, the Tenth Circuit considered whether law enforcement violated the Takings Clause of the Fifth Amendment by damaging the plaintiffs' home "during an attempt to apprehend a criminal suspect and later by refusing to compensate plaintiffs for this alleged taking."   791 F. App'x at 712.   After determining that law enforcement's actions fell within the scope of the police power and did not constitute a "taking", the Tenth Circuit recognized that "the police power is subject to the requirements of the Due Process Clause."   *Id.* at 719.   However, the *Lech* court did not analyze whether law enforcement's destruction of the plaintiff's house actually violated the Due Process Clause.   As such, *Lech* does not demonstrate that the Individual Defendants' actions violated clearly established law.   *See Carabajal*, 847 F.3d at 1213 (recognizing that "a hint as to what the law may be cannot substitute for clearly established law").

Nor do the remaining cases cited by Plaintiff make "the unlawfulness of the officers' actions apparent."   *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011). Plaintiff cites *Lowther v. United States*, 480 F.2d 1031 (10th Cir. 1973) for the proposition that law enforcement's destruction of property without authority to do so is contrary to the Due Process Clause.   (ECF No. 58 at 20.)   *Lowther* is distinguishable, however, as it involved firearms seized from a criminal defendant during the execution of a search warrant that were destroyed by federal agents after the defendant was acquitted of charges.   *See id.* at 1032–33.   Likewise, the cases cited by Plaintiff for the proposition that officers are responsible for their use of excessive force are distinguishable.   *See Estate of Booker v. Gomez*, 745 F.3d 405, 434 (10th Cir. 2014) (finding pretrial detainee's right to be free of excessive force, including use of neck

restraint, stun gun, and pressure on his back, while he was on his stomach and not resisting was clearly established); *Mick v. Brewer*, 76 F.3d 1127, 1135–36 (10th Cir. 1996) (analyzing excessive force during a *Terry* stop).[7]   These cases are a far cry from analyzing the constitutionality of the destruction of property during law enforcement's attempts to capture a criminal suspect during an armed standoff.

Because Plaintiff has not demonstrated that the Individual Defendants violated a clearly established right, Plaintiff has not met her burden to overcome the defense of qualified immunity.   Accordingly, Claim Five is dismissed against the Individual Officers without prejudice.

**D.      Municipal Liability Claims**

Plaintiff has brought the following claims against Denver: (1) a Fourth Amendment claim arising from Defendants' seizure of Plaintiff (¶¶ 152–62); (2) a Fourth Amendment claim arising from Defendants' seizure of the Residence (¶¶ 163–68); (3) a Fourteenth Amendment due process claim arising from Defendants' use of excessive force (¶¶ 169–82); and (4) a failure to train and supervise claim (¶¶ 183–99).

1.      *Monell* Liability

Section 1983 imposes liability on

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected,

---

[7]   It is true that law enforcement officials have an affirmative duty to intervene to prevent another law enforcement official's use of excessive force.   *See Mick*, 76 F.3d at 1136. However, because Plaintiff has not cited case law demonstrating that the Individual Defendants' conduct actually constituted excessive force, the Court cannot analyze Plaintiff's contention that the other Defendants' failure to intervene to prevent the excessive force violates § 1983.   (ECF Nos. 20–21.)

> any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws . . . .

42 U.S.C. § 1983.   The Supreme Court held in *Monell v. Department of Social Services*

that "person," as used in this statute, includes "municipalities and other local

government units," more specifically, "local government units which are not considered

part of the State for Eleventh Amendment purposes."   436 U.S. 658, 691 & n.54

(1978).[8]

However, a local government unit can be liable for damages under 42 U.S.C.

§ 1983 only when the its "policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the

[constitutional] injury."   *Id.* at 694.   The Supreme Court has thus "required a plaintiff

seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy'

or 'custom' that caused the plaintiff's injury," thereby "ensur[ing] that a municipality is

held liable only for those deprivations resulting from the decisions of its duly constituted

legislative body or of those officials whose acts may fairly be said to be those of the

municipality," rather than holding the municipality liable simply because it employed a

constitutional wrongdoer.   *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397,

403–04 (1997).

The relevant policy or custom can take several forms, including:

---

[8] The Eleventh Amendment reads, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Supreme Court construes this language to mean, among other things, that states may not be sued (even by their own citizens) for money damages in federal court.   *See Hans v. Louisiana*, 134 U.S. 1, 10–15 (1890).

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted; alterations incorporated).   But, whatever species of policy or custom is alleged,

> [t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.   That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan County*, 520 U.S. at 404 (emphasis in original).

   2.   <u>Claim Six: Failure to Train & Supervise</u>

   Plaintiff alleges that "Denver failed to properly train, supervise, and discipline its employees, with respect to unlawful seizure, excessive force, and the due process rights of residents," which constitutes a "custom, policy, or practice of Denver and [was] a driving force behind the constitutional violations" alleged in the lawsuit.   (¶¶ 187, 190.)   She further argues that "Denver has settled numerous excessive force, illegal seizure, failure to train, and failure to supervise complaints in the amount of millions of taxpayer dollars," and that "Denver was deliberately indifferent to the constitutional

rights of its residents."   (¶¶ 194–96.)

Under a failure to train claim, a plaintiff must ordinarily show a defendant had "actual or constructive notice that a particular omission in a [training] program caused official to violate citizens' constitutional rights" and nonetheless "made a conscious choice to retain [the] deficient training program."   *Connick v. Thompson*, 563 U.S. 51, 61 (2011).   A plaintiff must prove that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably said to have been deliberately indifferent to the need" for additional training.   *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see Whitewater v. Goss*, 192 F. App'x 794, 797 (10th Cir. 2006) (recognizing that claims for failure to supervise are treated under the same deliberate indifference standard).

Here, Plaintiff argues that Denver's failure to train and supervise is evidenced by its inability to demonstrate that it has training programs or materials "involving the use of flammable chemical munitions inside of buildings or information about the use of burn boxes."   (ECF No. 58 at 22.)   Plaintiff further argues that this failure to train "is a slap in a face to Tenth Circuit case law that has repeatedly warned law enforcement about the careless use of incendiary devices."   (*Id.*)   The case cited by Plaintiff, however, discusses the use of flash-bang devices by police, *not* the types of flammable devices at issue in this litigation.   *See Santistevan*, 983 F. Supp. 2d at 1320.   Moreover, the Tenth Circuit has not recognized that the use of flash-bang devices is presumptively unreasonable; instead, it recognized that the "reasonableness of detonating a

28

flash-bang device depends on the facts and circumstances of each case." *Id.* at 1319–20 (citing *Kirk v. Watkins*, 1999 WL 381119, at *3 (10th Cir. June 11, 1999)). Thus, Tenth Circuit case law does not give Denver actual or constructive notice that its particular use of flammable munitions was unlawful.

Moreover, Plaintiff's citation of prior cases involving Denver does not demonstrate that Denver had actual or constructive knowledge of training failures "concerning the Fourth and Fourteenth Amendments, the use of excessive force, the seizure of people and property, and due process rights of residents." (¶ 193.) Although Plaintiff cites several cases involving Denver and its use of excessive force or illegal seizures of suspects, the cases do not relate to either the use of flammable munitions, destruction of property during a police encounter, or the detention of potential witnesses during exigency. *See, e.g.*, *Zuchel v. City & Cnty. of Denver*, 997 F.2d 730 (10th Cir. 1993) (suspect shot by police officer); *Estate of Valverde v. Dodge*, 2019 WL 2992027 (D. Colo. July 9, 2019), *reversed,* 967 F.3d 1049 (10th Cir. 2020) (Defendant Dodge's shooting of suspect who pulled out a gun from his waistband during an arrest); *Sanchez, et al. v. City & Cnty. of Denver*, 11-cv-780-RBJ-KMT (alleged false arrest based on allegations of racial profiling).[9]   Although any uses of police excessive force are troubling, none of these scenarios come close to the scenario that Plaintiff faced on January 27, 2019.   Thus, Plaintiff has not plausibly alleged that Denver had actual or constructive notice about its inadequate training regarding either the use of flammable

---

[9] Plaintiff also cites numerous instances involving excessive force in which Denver settled claims for monetary payouts.  (¶¶ 124, 126–30.)  Because Plaintiff does not provide citations to these cases, the Court is unable to evaluate whether these cases should have given Denver actual or constructive notice regarding any training program and supervision deficiencies.

munitions or the detention of individuals during exigent circumstances.   This deficiency warrants dismissal of Plaintiff's failure to train and supervise claim.

    3.    <u>Claim Three: Fourth Amendment Seizure of Plaintiff</u>

Plaintiff sues Denver as part of her Fourth Amendment claim relating to Plaintiff's detention, alleging that "[t]he acts and omission of Defendants Perez and Alexander were pursuant to the custom, policy, or practice of Denver, which encourages, condones, tolerates, and ratifies the use of the unlawful seizure and deprivation of constitutionally protected interests by law enforcement officers."   (¶ 22.)

Defendants argue that this claim must be dismissed because the Amended Complaint "fails to identify any prior instances of substantially similar conduct by Denver employees but, rather, merely recites a list of various Denver-related lawsuits, none of which demonstrate that Denver was on notice that it required additional training or supervision regarding . . . the detention of witnesses during an emergency situation." (ECF No. 24 at 22.)

As explained in Part III.D.2, Plaintiff has not plausibly alleged municipal liability based on a failure to train and supervise theory.   Nor has Plaintiff alleged that an employee with final policymaking authority ordered Plaintiff to be detained or affirmatively ratified the decision to detain Plaintiff.   To the extent Plaintiff is alleging that Denver has an informal policy or custom of detaining potential witnesses in violation of the Fourth Amendment that amounts to a widespread practice, this claim is likewise unavailing.   As explained above, Plaintiff has not cited comparable instances in which Denver violated the Fourth Amendment by detaining potential witnesses.

Accordingly, the Motion is granted to the extent it seeks dismissal of Claim Three against Denver without prejudice.

    4.   <u>Claim Four: Fourth Amendment Seizure of the Residence</u>

As explained in Part III.C.3, Plaintiff has not plausibly alleged a Fourth Amendment violation claim against the Individual Defendants related to the seizure of the Residence.   For the same reasons, the Court finds that Plaintiff has not plausibly alleged a Fourth Amendment claim against Denver related to the seizure of the Residence.   *See Ellis ex rel. Estate of Ellis*, 589 F.3d at 1104 (recognizing that municipal liability will not attach "where there was no underlying constitutional violation by any of [the municipality's] officers").

Accordingly, Claim Four is dismissed against Denver without prejudice.

    5.   <u>Claim 5: Fourteenth Amendment / Excessive Force</u>

As explained in Part III.C.4, Plaintiff has not plausibly alleged a Fourteenth Amendment Due Process Claim against Individual Defendants.   For the same reasons, the Court finds that Plaintiff has not plausibly alleged a Fourteenth Amendment claim against Denver.   *See Ellis ex rel. Estate of Ellis*, 589 F.3d at 1104.

Accordingly, Claim Five is dismissed against Denver without prejudice.

## IV. CONCLUSION

For the reasons set for above, the Court ORDERS as follows:

1.   Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (ECF No. 24) is GRANTED IN PART AND DENIED IN PART as set forth herein;

    a.   Claim Four of the Amended Complaint (ECF No. 21) is DISMISSED WITH

PREJUDICE against Defendants Dodge, Eberharter, and Kohls and is

DISMISSED WITHOUT PREJUDICE against Defendant Denver;

b.      Claims Three, Five, and Six are DISMISSED WITHOUT PREJUDICE;

2.      The stay on discovery pending resolution of the Motion to Dismiss (ECF No. 46)

is LIFTED; and

3.      The parties are DIRECTED to jointly contact Magistrate Judge Kristen L. Mix's

chambers by no later than **January 25, 2021** to set a Status Conference, or such

other proceeding as Judge Mix deems appropriate to move this action forward.

Dated this 22nd day of January, 2021.

BY THE COURT:

William J. Martínez
United States District Judge